Filed 5/29/13  P. v. Cox CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>EARL GREGORY COX,<br><br>    Defendant and Appellant. | B235046<br><br>(Los Angeles County<br>Super. Ct. No. BA370577) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Alex Ricciardulli, Judge.  Affirmed.

Russell S. Babcock, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Lance E. Winters, Assistant Attorney General, Steven D. Matthews and David F. Glassman, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant and appellant Earl Gregory Cox appeals his convictions for second degree robbery, possession of a concealed firearm by a felon, and making criminal threats. Cox was sentenced to a term of 88 years to life in prison. He contends the trial court abused its discretion in consolidating his cases for trial, and there was insufficient evidence to support his convictions for making criminal threats. We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

1. *Facts.*

a. *People's evidence.*

(i) *Criminal threats to Patterson and McAllister.*

On March 30, 2010, Latoya Patterson and Elizabeth McAllister were doing laundry at a laundromat near 78th and Figueroa streets in Los Angeles. They made several trips on foot between McAllister's nearby home and the laundromat, carrying loads of laundry back and forth. At approximately 3:00 p.m., Cox, who appeared to be around 40 years old, was wearing a gray "hoodie" sweatshirt, and was riding a skateboard, approached them. He asked for their names and telephone numbers, and inquired whether they had boyfriends. Patterson told Cox she had a boyfriend, and McAllister replied that she was not interested.

Cox became "very aggressive and hostile" towards McAllister. He said, "Hey, bitch, I'm talking to you," repeatedly bumped his chest against her body, balled up his hands into fists, and repeatedly feinted towards her, as if he was going to hit her. When McAllister told him she was a lady, not a "bitch," Cox responded, "You don't know where you are at," "this is Hoover," and "this is my hood." Cox told the women he was "going to shoot us in our face, drag us back to his neighborhood and rape us. He was going to put us out there as prostitutes and things of that sort." He called the women "whores and tricks," and stated "he would put a gun to our mouth and make us suck on it[.]" He also stated he would have his gang "jump" them.

Patterson was aware Hoover was a well-known criminal street gang with a reputation "for hitting women" and committing robberies. She had previously been robbed by Hoover gang members. Hoover gang members lived next door to her, so she

2

had observed "how they interact with people, what they do." Even though she was frightened, Patterson jumped between Cox and McAllister and pushed Cox away. Cox bumped against Patterson and continued yelling at McAllister. As Patterson described it, "So we are in a sandwich, he's bumping against me but he's talking past me to her, so I'm constantly pushing him off of her to get him away." Cox was at times "nose-to-nose" with each woman.

McAllister told Cox that if he did not leave them alone, she would call her brother. Cox "became more aggressive and . . . jumped back in her face." He "had his fists out and chest out." He told McAllister he would fight her brother and shoot and "kill him, too." Cox "continued to say—that was every other word, kept on claiming where he's from, what he can do to us, you know, over and over again." Cox kept his hand in his waistband and appeared to be holding something. He pulled upwards on the item each time he threatened to shoot. Both women believed he had a gun, although they did not see one. Both women testified that they were afraid for their safety and believed Cox could carry out his threats.

The women crossed the street. Cox followed, still "yelling out where he's from, what he's going to do to us." When the women entered the laundromat, Cox followed them inside. Ten to fifteen other women and children were present. Cox continued threatening to shoot the women, referencing the Hoover gang, and gesturing as if he was going to hit McAllister. He told McAllister he would "come back for" her. He informed both women he would see them when they came out of the laundromat.

Patterson told him they did not want any problems and asked him to leave them alone. Cox did not reply but appeared to be so angry he was "shaking." Discerning that Cox felt "disrespected," Patterson talked to him until he calmed down. He left the laundromat. The entire incident lasted approximately 15 minutes.

The women did not call 911 and continued to do their laundry. However, they were "actually scared to go back to [McAllister's] house," so throughout the day McAllister's brother brought loads of laundry to them at the laundromat.

3

As they headed home with the last load of laundry at approximately 8:00 p.m., the street was quiet and deserted. Patterson and McAllister heard the sound of a skateboard, and turned to find Cox approaching them. He said, "Hey, hey, bitches, you thought I forgot all about it." He stated to McAllister, "I told you I'll be back. . . . [T]his is Hoover hood. And where your brother at?" Cox then punched McAllister in the jaw with a closed fist, throwing her against a gate. When Cox went at McAllister again, Patterson intervened and attempted to push him away from her. The three of them struggled. Cox backed up and stated he was going to wait for McAllister's brother and would "shoot him, too." When making this statement Cox again put his hand in his waistband. The women got up and headed toward McAllister's home, and Cox went the other way.

Patterson called 911. McAllister called her brother. Both women testified that they felt frightened by Cox's threats and believed he would follow through on them. Patterson testified that, in the area where the incidents occurred, "if something happens to you it just happens. No one is going to help you, you're by yourself. [¶] So when he approached us again I felt there was nothing I could do. I felt like—well, I knew he could do whatever he wanted to do because of the way it goes around there. The gangs run it, and they have control over what happens, who says what and things of that sort."

Police were unable to immediately apprehend Cox.

A few months later, both women identified Cox as the assailant in a pretrial photographic lineup. They also identified him at the preliminary hearing, and at trial.

(ii) *Robbery of Bradford.*

On April 22, 2010, at approximately 3:00 p.m., Keyanna Bradford was walking in the area of 75th and Figueroa streets in Los Angeles. Cox, riding his skateboard and wearing a gray hoodie, approached and asked for her telephone number and whether she had a boyfriend. She declined to answer his questions. He then asked if she was "whoring over here." When Cox continued speaking to her, Bradford said, "Boy, bye." Cox became angry and aggressive and stated, "Don't call me a boy, bitch, I'll shoot you in [the] face." When Bradford attempted to walk away, Cox followed her on his

4

skateboard and grabbed her purse. She resisted until she observed a gun under Cox's sweatshirt. As Cox was skating away with her purse, Bradford pretended to call 911. Cox turned around and said, " 'Are you calling your boyfriend? I'll shoot him in the face too.' " Cox tripped, dropped the purse, and rode off. Bradford recovered her belongings and called 911.

Two Los Angeles Police Department officers who were responding to Bradford's call saw Cox riding his skateboard. They blocked his path and ordered him to stop. Cox raised his hands and said, " 'What did I do?' " He then fled, holding a gun, with the officers pursuing him on foot. The officers apprehended him shortly thereafter. Bradford identified him as the robber in a field showup, and at trial. She also identified a gun found on the ground where he had been running as the weapon she had observed.

b. *Defense case.*

The defense presented the testimony of an eyewitness identification expert.

2. *Procedure.*

Trial was by jury. Cox was convicted of the second degree robbery of Bradford (Pen. Code, § 211);[1] possession of a firearm by a felon (former § 12021, subd. (a)(1)); possession of a concealed firearm by a felon (former § 12025, subd. (a)(2)); and two counts of making criminal threats (§ 422). The jury deadlocked on the allegation that Cox personally used a gun in commission of the robbery of Bradford, and that allegation was dismissed in furtherance of justice. In a bifurcated proceeding, the trial court found Cox had suffered two prior convictions for serious or violent felonies (§§ 667, subds. (a), (b)-(i), 1170.12, subds. (a)-(d)) and had served a prior prison term within the meaning of section 667.5, subdivision (b). It sentenced Cox to a term of 88 years to life in prison. It imposed a restitution fine, a suspended parole restitution fine, a court security assessment, a criminal conviction assessment, and a crime prevention fee. Cox appeals.

---

[1]    All further undesignated statutory references are to the Penal Code.

DISCUSSION

1. *The cases were properly joined.*

a. *Additional facts.*

The People filed separate charges against Cox in the criminal threats and robbery/firearm possession cases. Thereafter the prosecution filed a single amended complaint and moved to consolidate the two matters. The prosecutor argued that the matters were of the same class, and if separate trials were held, she would seek to introduce evidence of the crimes at both trials to prove, inter alia, identity and intent. Cox opposed the motion, arguing consolidation would be prejudicial. After a hearing, the trial court ordered the two cases consolidated for trial. It reasoned that the offenses were of the same class; occurred within a month of each other; and involved similar victims and "the same sort of behavior, assaultive behavior, abusive behavior."

Cox argues joinder was improper because (1) the two cases were not of the same class; and (2) consolidation enabled the People to use the "factually strong" robbery case to bolster the "factually weak" criminal threats case. We disagree.

b. *Discussion.*

Section 954 provides that an accusatory pleading may charge two or more different offenses if they are either (1) "connected together in their commission," or (2) "of the same class." (§ 954;[2] *People v. Soper* (2009) 45 Cal.4th 759, 769 (*Soper*).)

_____

[2]    Section 954 provides: "An accusatory pleading may charge two or more different offenses connected together in their commission, or different statements of the same offense or two or more different offenses of the same class of crimes or offenses, under separate counts, and if two or more accusatory pleadings are filed in such cases in the same court, the court may order them to be consolidated. The prosecution is not required to elect between the different offenses or counts set forth in the accusatory pleading, but the defendant may be convicted of any number of the offenses charged, and each offense of which the defendant is convicted must be stated in the verdict or the finding of the court; provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. An acquittal of one or more counts shall not be deemed an acquittal of any other count."

6

The law favors the joinder of counts because it promotes efficiency. (*People v. Myles* (2012) 53 Cal.4th 1181, 1200 (*Myles*); *Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220 (*Alcala*).) Nonetheless, a trial court has discretion to order that offenses be tried separately. (*Soper,* at p. 769; *People v. Elliott* (2012) 53 Cal.4th 535, 551.) Because of the state's interest in joinder, a trial court has broader discretion in ruling on a motion for severance than it does on the admission of evidence. (*Alcala,* at p. 1221.)

Cox avers that joinder was improper because the offenses were neither connected nor of the same class. He urges that robbery involves taking property, while violation of section 422 requires only verbal threats. Robbery and possession of a firearm, on the one hand, and criminal threats, on the other, have "completely different sets of circumstances to fulfill the elements for conviction."

Offenses are of the same class if they possess common characteristics or attributes. (*People v. Koontz* (2002) 27 Cal.4th 1041, 1075; *People v. Moore* (1986) 185 Cal.App.3d 1005, 1012-1013; *People v. Leney* (1989) 213 Cal.App.3d 265, 269.) Robbery requires a taking of property in the possession of another, from his or her person or immediate presence, against his or her will, by means of force or fear. (§ 211.) Section 422, the criminal threats statute, requires that the defendant threaten to commit a crime which would result in death or great bodily injury to another, which causes the victim "reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety." (§ 422, subd. (a).) Thus, both offenses are crimes against the person with the common, central element of causing the victim fear of bodily harm. (Cf. *People v. Musselwhite* (1998) 17 Cal.4th 1216, 1243 [robbery and murder are the same class of crime in that both involve the common element of assault on the victim]; *People v. Arias* (1996) 13 Cal.4th 92, 127 [murder, robbery, kidnapping, rape, and other sex crimes were of the same class because all involved assaultive behavior]; *People v. Thomas* (1990) 219 Cal.App.3d 134, 139-140 [attempted murder, robbery, and ex-felon in possession of a firearm were all assaultive offenses against the person, and thus of the same class].)

Arguably, the offenses were also "connected together in their commission." The use of the "connected together in their commission" language in section 954

7

demonstrates the Legislature's intent that the test for joinder be "very broad." (*Alcala, supra,* 43 Cal.4th at p. 1217.) The requirement may be satisfied "even though 'the offenses charged "do not relate to the same transaction and were committed at different times and places . . . against different victims." ' " (*Alcala*, at p. 1218, italics omitted; *People v. Valdez* (2004) 32 Cal.4th 73, 119; *People v. Mendoza* (2000) 24 Cal.4th 130, 160.) Offenses are connected together in their commission if they share an " ' "element of substantial importance." ' " (*Alcala*, at p. 1218, italics omitted; *Valdez,* at p. 119.) Here the offenses were connected within the meaning of section 954 because they shared a common element of substantial importance: Cox's intent to intimidate, terrorize, and bully the victims. (See *Alcala*, at p. 1219 [the "intent or motivation with which different acts are committed can qualify as a 'common element of substantial importance' in their commission and establish that such crimes were 'connected together in their commission' "].) In both incidents Cox engaged in assaultive conduct against the victims, punching McAllister, chest bumping Patterson, and struggling with Bradford over her purse. Accordingly, the statutory requirements for joinder were met.

Because the statutory requirements for joinder were satisfied, Cox can establish that the trial court's ruling was an abuse of discretion only by making a clear showing of prejudice. (*People v. Thomas* (2012) 53 Cal.4th 771, 798; *People v. McKinnon* (2011) 52 Cal.4th 610, 630; *People v. Vines* (2011) 51 Cal.4th 830, 855 (*Vines*); *Alcala, supra,* 43 Cal.4th at p. 1220.) A trial court's ruling on the issue amounts to an abuse of discretion only if it falls outside the bounds of reason. (*Soper, supra,* 45 Cal.4th at p. 774.) In determining whether the court abused its discretion, we consider the record before the court when the ruling was made. (*Ibid*.; *Thomas, supra*, at p. 798.)

To determine whether joinder was proper, we first consider the cross admissibility of the evidence in hypothetical separate trials. (*People v. Thomas, supra,* 53 Cal.4th at p. 798; *Soper, supra,* 45 Cal.4th at pp. 774-775.) If the evidence underlying the charges would have been cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice. (*Soper,* at p. 775; *Myles, supra*, 53 Cal.4th at pp. 1200-1201.) "[C]omplete (or so-called two-way) cross-admissibility is not required. . . . [I]t may be

8

sufficient . . . if evidence underlying charge 'B' is admissible in the trial of charge 'A'—even though evidence underlying charge 'A' may not be similarly admissible in the trial of charge 'B.' [Citations.]" (*Alcala, supra,* 43 Cal.4th at p. 1221.)

Here, evidence of the Bradford robbery would have been cross-admissible in the Patterson/McAllister threats case. Evidence Code section 1101, subdivision (a), generally prohibits the admission of evidence of a defendant's conduct on a specific occasion to prove he or she has a bad character or a disposition to commit the charged crime. (*Vines, supra,* 51 Cal.4th at p. 856; *People v. Rogers* (2009) 46 Cal.4th 1136, 1165.) However, other crimes evidence is admissible if it is relevant to prove, among other things, intent, identity, or the existence of a common design or plan. (Evid. Code, § 1101, subd. (b);[3] *Vines*, at p. 856; *People v. Carter* (2005) 36 Cal.4th 1114, 1147; *People v. Ewoldt* (1994) 7 Cal.4th 380, 400.) "[T]here exists a continuum concerning the degree of similarity required for cross-admissibility, depending upon the purpose for which introduction of the evidence is sought[.]" (*Soper, supra,* 45 Cal.4th at p. 776; *Alcala, supra*, 43 Cal.4th at p. 1222.) The highest degree of similarity is required to prove identity. The offenses must share common features that are distinctive enough to support the inference that the same person committed both acts. (*Soper,* at p. 776, fn. 9; *Vines*, at pp. 856-857; *Alcala*, at p. 1223, fn. 13; *Ewoldt*, at p. 403.) " ' "The pattern and characteristics of the crimes must be so unusual and distinctive as to be like a signature."

---

[3]   Evidence Code section 1101 provides in pertinent part: "(a) Except as provided in this section and in Sections 1102, 1103, 1108, and 1109, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion.

"(b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act."

9

[Citation.]' " (*Soper*, at p. 776, fn. 9; *Ewoldt,* at p. 403.) An " 'inference of identity . . . need not depend on one or more unique or nearly unique common features; features of substantial but lesser distinctiveness may yield a distinctive combination when considered together.' [Citation.]" (*Vines*, at p. 857.) Cox bears the burden of establishing the absence of cross-admissibility. (*Alcala,* at p. 1222, fn. 11.)

Similarities in the two incidents made the evidence of the Bradford robbery relevant on the issue of identity in the threats case. The Patterson/McAllister and Bradford crimes occurred less than a month apart, on March 30, 2010 and April 22, 2010, respectively. Cox's initial contact with the victims in both incidents occurred at approximately 3:00 p.m. The crimes occurred within three blocks of each other. In both instances, Cox was riding a skateboard. He appeared to be 39 or 40 years old, older than most skateboard enthusiasts. As Patterson testified, "he looked very old to be on a skateboard." In both incidents, he was wearing an oversized, gray "hoodie" sweatshirt. In both instances, he accosted women who were walking down the street and asked whether they had boyfriends, and for their telephone numbers. When rebuffed, Cox became aggressive and hostile. His response in both situations—threatening physical harm to the victims and physically accosting them—was far out of proportion to the perceived slight. He followed all the victims on his skateboard. In both incidents he threatened to shoot the victims in the face. In both instances, he referenced prostitution, threatening to "put [McAllister and Patterson] out there as prostitutes" and asking Bradford whether she was a prostitute. He positioned himself "nose-to-nose" with the victims in the Patterson/McAllister case, and within eight inches of the victim's face in the Bradford robbery. He also threatened to shoot persons the victims called for assistance. When McAllister stated she was going to call her brother, Cox responded that he would shoot the brother. When Bradford called, or pretended to call, police, Cox asked whether she was calling her boyfriend and threatened to shoot him. Cox appeared to be armed in both incidents and kept his hand in his pocket or waistband area. Finally, Cox engaged in physical violence toward the victims in both incidents, chest-bumping Patterson, punching McAllister, and struggling with Bradford over her purse. These

10

facts, taken together, were sufficiently similar and unique to prove Cox was the culprit in both incidents. "In the aggregate, these common features support a reasonable inference that defendant committed both sets of offenses." (See *Vines, supra,* 51 Cal.4th at p. 858; *Soper, supra,* 45 Cal.4th at pp. 778-779 & fn. 14; *Alcala, supra,* 43 Cal.4th at p. 1224.) The defense theory on the criminal threats charges was that Patterson and McAllister had misidentified him. Thus, proof on the issue of identity was highly relevant and probative.

Because the evidence would have been cross-admissible in separate trials, any suggestion of prejudice has been dispelled and joinder was proper. (*Soper, supra,* 45 Cal.4th at p. 775; *Myles, supra,* 53 Cal.4th at pp. 1200-1201; *Alcala, supra,* 43 Cal.4th at p. 1221.) But even assuming arguendo that the evidence was not cross-admissible, Cox has failed to show prejudice. Cross-admissibility is not a prerequisite to joinder. (§ 954.1; *People v. Elliott, supra,* 53 Cal.4th at p. 553; *Myles*, at p. 1201; *People v. Thomas* (2011) 52 Cal.4th 336, 350.) When cross-admissibility is absent, to determine prejudice we consider (1) whether some of the charges were particularly likely to inflame the jury against the defendant; (2) whether a weak case was joined with a strong case or another weak case so that the totality of the evidence might alter the outcome as to some or all of the charges; and (3) whether one of the charges was a capital offense or joinder converted the matter into a capital case. (*Soper,* at p. 775; *Myles*, at p. 1201; *Alcala*, at p. 1220.) We then balance the potential for prejudice from a joint trial against the countervailing benefits to the state. (*Myles*, at p. 1201.)

None of the factors point to a potential for prejudice that outweighed the benefits of joint trial in the instant matter. Neither case was more inflammatory than the other. The victims, and Cox's behavior, were similar in both incidents. The crimes were "similar in nature and equally egregious—hence neither, when compared to the other, was likely to unduly inflame a jury against defendant." (*Soper, supra,* 45 Cal.4th at p. 780; see also *Myles, supra,* 53 Cal.4th at p. 1202; *Alcala, supra,* 43 Cal.4th at p. 1227.)

Contrary to Cox's argument, neither case was significantly stronger than the other. In the threats case, both victims identified Cox in a pretrial photographic lineup, at the preliminary hearing, and at trial. In the robbery case, the victim identified Cox when he

11

was apprehended at the scene, and at trial. Both cases, therefore, were primarily proven with direct testimony. (See *Soper, supra,* 45 Cal.4th at p. 780 [where similar fingerprint evidence and witness testimony was offered in both cases, the fact DNA evidence also linked the defendant to one of the crimes did not demonstrate the cases were unbalanced]; *People v. Gonzales and Soliz* (2011) 52 Cal.4th 254, 282-283; *People v. McKinnon, supra,* 52 Cal.4th at pp. 631-632.) There was not the "extreme disparity between weak and strong cases" required to show potential prejudice. (*Belton v. Superior Court* (1993) 19 Cal.App.4th 1279, 1284.)

Cox argues that the evidence in the criminal threats case was insufficient to support his convictions for making criminal threats. As we discuss *post,* he is incorrect. He also argues that the threats case was weak because Patterson's and McAllister's identifications were tainted by an impermissibly suggestive photographic lineup, in that he was the only person in the lineup wearing a gray "hoodie." Cox has not raised the purportedly suggestive lineup as an issue on appeal, and we do not view it as particularly problematic. Both Patterson and McAllister testified that they recognized Cox's photograph and facial features immediately. Patterson did not notice Cox was wearing a sweatshirt in the lineup. Although the sweatshirt was the first thing McAllister noticed, there is no suggestion she identified Cox because he was the only one so attired; rather, her testimony indicated she recognized the sweatshirt—which was Cox's—as the assailant's. She further testified that she recognized his facial structure, eyes, and cheeks, and that Cox's was "a hard face to forget."

In any event, "as between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence . . . will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges." (*Soper, supra,* 45 Cal.4th at p. 781; *People v. Thomas, supra,* 53 Cal.4th at p. 799.) "[T]he benefits of joinder are not outweighed—and severance is not required— merely because properly joined charges might make it more difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately

12

tried." (*Soper*, at p. 781.) Finally, neither case was a capital offense, whether tried singly or together. Thus, whether viewed as the case was actually tried (*id*. at p. 783; *Thomas,* at p. 801; *People v. Gonzales and Soliz, supra,* 52 Cal.4th at p. 281), or as it appeared at the time the ruling was made, no prejudice is apparent. The trial court did not abuse its discretion or violate Cox's constitutional rights by ordering joinder.

    2. *Sufficiency of the evidence.*

Cox next complains that the evidence was insufficient to prove the criminal threats charges. When determining whether the evidence was sufficient to sustain a criminal conviction, "we review the whole record in the light most favorable to the judgment below to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible and of solid value—from which a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citations.]" (*People v. Snow* (2003) 30 Cal.4th 43, 66; *People v. Carrington* (2009) 47 Cal.4th 145, 186-187.) We presume in support of the judgment the existence of every fact the trier of fact could reasonably deduce from the evidence. (*People v. Medina* (2009) 46 Cal.4th 913, 919.) Reversal is not warranted unless it appears " 'that upon no hypothesis whatever is there sufficient substantial evidence to support [the conviction].' [Citation.]" (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Zamudio* (2008) 43 Cal.4th 327, 357.)

Section 422 makes it an offense to willfully threaten to commit a crime which will result in death or great bodily injury to another person under specified circumstances.[4]

---

[4] Section 422 provides in pertinent part: "(a) Any person who willfully threatens to commit a crime which will result in death or great bodily injury to another person, with the specific intent that the statement, made verbally, in writing, or by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety or for his or her immediate family's safety, shall be punished by imprisonment . . . ."

13

(*People v. Toledo* (2001) 26 Cal.4th 221, 224; *People v. Maciel* (2003) 113 Cal.App.4th 679, 685-686.) "In order to prove a violation of section 422, the prosecution must establish all of the following: (1) that the defendant 'willfully threaten[ed] to commit a crime which will result in death or great bodily injury to another person,' (2) that the defendant made the threat 'with the specific intent that the statement . . . is to be taken as a threat, even if there is no intent of actually carrying it out,' (3) that the threat . . . was 'on its face and under the circumstances in which it [was] made, . . . so unequivocal, unconditional, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat,' (4) that the threat actually caused the person threatened 'to be in sustained fear for his or her own safety or for his or her immediate family's safety,' and (5) that the threatened person's fear was 'reasonabl[e]' under the circumstances." (*Toledo*, at pp. 227-228; see generally *People v. Bolin, supra*, 18 Cal.4th at p. 337; *In re George T.* (2004) 33 Cal.4th 620, 630.) When considering the sufficiency of the evidence to support a criminal threats conviction, we evaluate the totality of the circumstances, including the parties' prior contacts and the manner in which the communication was made, to determine whether the communication conveyed to the victim a gravity of purpose and an immediate prospect of execution of the threat. (*In re Ryan D.* (2002) 100 Cal.App.4th 854, 859-860; *People v. Butler* (2000) 85 Cal.App.4th 745, 753-754; *In re Ricky T.* (2001) 87 Cal.App.4th 1132, 1137; *People v. Solis* (2001) 90 Cal.App.4th 1002, 1013.)

"The phrase 'will result in great bodily injury' means objectively, i.e., to a reasonable person, likely to result in great bodily injury based on all the surrounding circumstances." (*People v. Maciel, supra,* 113 Cal.App.4th at p. 685.) "Great bodily injury" means " 'a significant or substantial physical injury.' " (*Id.* at p. 686.) "Sustained fear" means "a period of time that extends beyond what is momentary, fleeting, or transitory." (*People v. Allen* (1995) 33 Cal.App.4th 1149, 1156 (*Allen*).) However, the period need not be lengthy. (*Ibid.* [under the circumstances, 15 minutes of fear was sufficient]; *People v. Fierro* (2010) 180 Cal.App.4th 1342, 1348-1349 & fn. 5 (*Fierro*) [sustained fear element met where the defendant's threat to kill the victim and display of

14

a weapon lasted only "a minute or so," and victim was afraid for up to 15 minutes after driving to a place of safety and calling police].)  "Immediate" means "that degree of seriousness and imminence which is understood by the victim to be attached to the *future prospect* of the threat being carried out . . . ." (*People v. Melhado* (1998) 60 Cal.App.4th 1529, 1538.)

Appropriately, Cox does not dispute that the evidence was sufficient to support the first, second, third, and fifth elements of section 422.  Cox's statements that he would shoot and rape the victims were express threats to commit crimes which would have resulted in the victims' death or very serious bodily injuries.  (See *Fierro, supra,* 180 Cal.App.4th at p. 1348; *People v. Butler, supra,* 85 Cal.App.4th at p. 752.)  Cox's conduct of following the victims, chest bumping them, feinting punches at McAllister, and eventually punching her and knocking her to the ground; the fact he appeared to be armed; his repeated references to his criminal street gang; the victims' direct testimony that they were afraid for their lives; and Patterson's familiarity with the Hoover gang's exploits, provided ample evidence proving that Cox intended his statements to be taken as a threat, that the threat was sufficiently unconditional and immediate, and that the victims' fear was reasonable.  (See generally *Fierro,* at p. 1348; *People v. Wilson* (2010) 186 Cal.App.4th 789, 814-815.)

However, Cox complains that the evidence was insufficient to prove the fourth element, that his threats caused the victims to be in sustained fear for their or their immediate family's safety.  He argues that the women's behavior after their first encounter with him did not indicate sustained fear, because:  (1) neither the victims, nor anyone else in the laundromat, called 911; (2) McAllister and Patterson continued doing their laundry for approximately five hours after he left; (3) McAllister testified that after Cox left the laundromat, she no longer felt he was a threat; (4) Patterson testified that she felt the issue had been resolved because she was able to calm Cox down at the laundromat; and (5) Patterson testified that in the area where the crimes occurred, which was known for prostitution, "guys just say things, random things, and threaten girls all the time."  Cox hypothesizes that "the only reasonable interpretation" of the evidence was

that he approached the victims with the intention "of 'hitting' on them"; once rebuffed, he "made some disrespectful comments." However, neither woman took his remarks seriously and "most likely felt [Cox] was being disrespectful and . . . would eventually leave them alone." He posits that "any fear suffered by [the victims] was fleeting and temporary and certainly not sustained."

Cox's argument is not persuasive for a variety of reasons. First, it mischaracterizes the record. The victims' testimony is incompatible with the notion that they viewed Cox's threats as nothing more than disrespectful, but harmless, comments. Patterson testified that during the first encounter with Cox, she was "afraid for both our safety." When she stepped in to defend McAllister, she "felt afraid. It was nothing we could do but stick together." She believed Cox would actually shoot them; "[w]hen he said, Hoover, I know what they are capable of doing and the stories and what I've seen." McAllister testified that during the first encounter, she "felt . . . frightened for my life." She thought Cox would follow through with his threats. Both women believed he had a weapon. Further, Cox's verbal threats were accompanied by threatening gestures and physical contact with the women.

The first encounter lasted for 15 minutes. Patterson testified that after Cox left the laundromat, the women were "actually scared to go back to the house," so McAllister's brother brought loads of laundry to them at the laundromat throughout the remainder of the day. Patterson explained the women eventually walked home without McAllister's brother because they "had no choice." From this evidence, the jury could reasonably have concluded that the victims were in sustained fear during the 15 minutes the encounter actually lasted, as well as for several hours afterward. This was more than sufficient to establish the sustained fear element. (See *Allen, supra,* 33 Cal.App.4th at p. 1156; *Fierro, supra,* 180 Cal.App.4th at pp. 1348-1349; *contrast In re Ricky T., supra,* 87 Cal.App.4th at pp. 1139-1140 [insubstantial evidence where the victim felt fearful for only a moment].) Indeed, in *Fierro* and *Allen,* the actual threats lasted for only a brief period, but the victims remained afraid for approximately 15 minutes. (See *Fierro,* at

p. 1349, fn. 6.) Here, the *threats themselves* were ongoing for approximately 15 minutes. Moreover, *Fierro* held that even where a threat to kill the victim lasted only a minute, the victim's fear during the threat qualified as "sustained" for purposes of section 422. "When one believes he is about to die, a minute is longer than 'momentary, fleeting, or transitory.' " (*Fierro,* at p. 1349.)

Patterson did testify that men in the area tended to "say things, random things, and threaten girls all the time," but clarified that the typical comments were not "to this extreme." As to the failure of other laundromat patrons to call 911, Patterson testified that the dryers, which were quite tall, blocked the view and "no one [was] around" them when Cox made the threats. As a factual matter, the evidence on these points clearly did not compel a finding of insufficiency.

Cox is correct that the victims' testimony was somewhat equivocal regarding their reasons for not calling for help after he left the laundromat.[5] As noted, the evidence also showed the victims did not return to McAllister's home for several hours after the first

---

[5]    When asked why she did not call 911 immediately after Cox left the laundromat, Patterson stated: "Because I felt that I talked him down and he left . . . ." The women continued to do the laundry, "[b]ut we also was scared because he did say he was going to come back. But because he left kind of peacefully, we didn't think nothing of it. So we just continued to do our laundry until we were done." When asked how she felt during the incident, she stated: "We felt . . . it could happen. [¶] . . . [¶] [] But then, again, the area we live in is like—we felt it could happen, but who is going to help us, like. [¶] . . . It's hard to explain. We felt like he can do it, because he was gesturing, he already made contact with us. But it was a question of when it was going to happen, if he was going to carry out through it—with it. That was the doubt we had."

McAllister testified that she did not call for help after the first encounter "Because [Cox] failed to appear. I felt we could just go home and leave it alone, and I did not want to make it a big deal." She did not call her brother for assistance after the first encounter because she did not want him to "get involved in anything that might have caused harm to him. And secondly, because I felt that it wasn't a threat at that time[.] [B]ut I did feel threatened to my life, but I thought he was just going to leave it alone, and he did not." She "felt threatened the whole time," but "just didn't feel threatened enough to call my brother."

incident because they were afraid. To the extent the victims' testimony was inconsistent or inarticulate on these points, it was for the jury, not this court, to resolve any contradictions in the evidence. We resolve neither credibility issues nor evidentiary conflicts. (*People v. Mejia* (2007) 155 Cal.App.4th 86, 98; *People v. Friend* (2009) 47 Cal.4th 1, 41; *People v. Cortes* (1999) 71 Cal.App.4th 62, 81.)

Cox's argument also ignores the evidence that after he accosted the women the second time, as they were walking home from the laundromat in the evening, they *did* call for help: Patterson called 911 and McAllister called her brother. Both victims clearly testified that at that point, they were afraid and believed Cox would follow through on his threats. Both victims knew police were unable to apprehend Cox that evening, and the jury could reasonably have inferred the victims' fear did not immediately dissipate upon Cox's departure. Indeed, McAllister testified that when she was shown a photographic lineup several months after the incident, "As soon as I saw the paper, my heart started racing . . . ." She "felt nervous and scared, like I did at the time of the incident. And as soon as I saw the picture I just knew that's him, because he was just all in my face the whole day, and I felt very threatened." Similarly, when asked how she was able to recognize Cox in the courtroom, Patterson testified: "Well, I can't forget. This never happened to me. I would never forget a face like that, because I know—I live in that area, and if he was to be free I would want to know what he looks like, so if I ever see him I know . . . what to do. And so I will never forget his face." These statements suggested the victims' fear did not evaporate as soon as Cox left the scene after the second encounter.

In sum, because substantial evidence supported the verdicts, the fact the evidence might have been reconciled with a contrary finding does not warrant a reversal. (*People v. Livingston* (2012) 53 Cal.4th 1145, 1170; *People v. Martinez* (2008) 158 Cal.App.4th 1324, 1331.)

Cox next argues that cases construing the "sustained fear" element of section 422, including our decision in *Allen, supra,* 33 Cal.App.4th 1149, have misinterpreted the

18

meaning of that term. He invites us to reconsider the issue and require a more demanding evidentiary showing than that we found sufficient in *Allen.*

In *Allen,* the defendant harassed and terrorized his ex-girlfriend, Irons, over a seven-month period. In five different incidents, Allen variously threatened her, seriously vandalized her apartment, broke into her apartment, and beat her. A few months later Allen went to the home of Irons's mother, Williams, pointed a gun at Williams, and threatened to kill her and Irons. Williams called police, who apprehended Allen 15 minutes later. (*Allen*, *supra*, 33 Cal.App.4th at pp. 1151-1153.) Allen was convicted of, inter alia, violating section 422 for making criminal threats against Williams. (*Allen*, at p. 1154.) Allen contended on appeal that because the police had arrested him within 15 minutes of the incident, the evidence was insufficient to establish Williams experienced the "sustained fear" required by the statute. (*Id.* at p. 1155.) After observing that "sustained fear" was not defined in section 422, we reasoned: "Defining the word 'sustained' by its opposites, we find that it means a period of time that extends beyond what is momentary, fleeting, or transitory. . . . Fifteen minutes of fear of a defendant who is armed, mobile, and at large, and who has threatened to kill the victim and her daughter, is more than sufficient to constitute 'sustained' fear for purposes of this element of section 422." (*Allen*, at p. 1156.) We noted that in other contexts, namely, the elements necessary to prove premeditation and deliberation or lying in wait, no specific minimum time period was required. (*Id.* at p. 1156, fn. 6.)

Cox urges that *Allen* was wrongly decided. He posits that it is illogical to define a term by reference to its opposites. Furthermore, he asserts that *Allen* inappropriately treated the adjective "sustained" as a noun, and "sustained" cannot mean "period of time." Instead, he points to one of the definitions of the term found in the Oxford English Dictionary: " 'Kept up without intermission or flagging; maintained through successive stages or over a long period; kept up or maintained at a uniform (esp. a high) pitch or level.' " Based on this definition, he posits that a more appropriate definition of "sustained fear" would be "prolonged, continuous, and of consistent intensity."

19

Cox also points to an alternative definition of "sustained fear" found in subdivision (b) of section 11418.5. Section 11418.5 pertains to threats to use a weapon of mass destruction, and in most respects mirrors section 422's language.[6] Subdivision (b) of section 11418.5 defines "sustained fear" as follows: "For the purposes of this section, 'sustained fear' can be established by, but is not limited to, conduct such as evacuation of any building by any occupant, evacuation of any school by any employee or student, evacuation of any home by any resident or occupant, any isolation, quarantine, or decontamination effort." Thus, under section 11418.5, "sustained fear" may be established by inferences drawn from conduct in response to a threat. (See *People v. Turnage* (2012) 55 Cal.4th 62, 75.) This definition, Cox posits, "reveals the Legislature's conclusion that the trier of fact should look to evidence of the complaining witness's behavior" to determine whether sustained fear existed.

We decline Cox's invitation to revisit *Allen.* We are not persuaded by his linguistic arguments. In our view, there is nothing illogical in defining "sustained" as extending beyond what is momentary, fleeting, or transitory. Cox offers no authority for the proposition that the Legislature intended section 422 to apply only when the victim's fear exists, at a steady level of intensity, for a "prolonged" period of time. Such a standard, in our view, could cause confusion and might be interpreted to require an unreasonably high evidentiary showing. Defining "sustained fear" as "prolonged" would also give rise to considerable ambiguity. "Prolonged," as used in common parlance, may

---

[6]     Subdivision (a) of the statute provides in pertinent part: "Any person who knowingly threatens to use a weapon of mass destruction, with the specific intent that the statement as defined in Section 225 of the Evidence Code or a statement made by means of an electronic communication device, is to be taken as a threat, even if there is no intent of actually carrying it out, which, on its face and under the circumstances in which it is made, is so unequivocal, immediate, and specific as to convey to the person threatened, a gravity of purpose and an immediate prospect of execution of the threat, and thereby causes that person reasonably to be in sustained fear for his or her own safety, or for his or her immediate family's safety shall be punished by imprisonment . . . ." (§ 11418.5.)

have a variety of meanings which are necessarily dependent upon the context. An economic downturn, for example, might be considered to be "prolonged" only if it lasted for months or years. A bout of the flu might be described as prolonged if it lasted for two weeks. An especially tedious conversation with an acquaintance might be described as prolonged if it continued for half an hour. In any event, where an apparently armed gang member threatens two vulnerable women with an unceasing barrage of threats to kill and rape them, we have no difficulty holding that the incident, and therefore the victims' fear, was "prolonged." We also note that other courts have adopted the *Allen* definition of "sustained fear," which is now also embodied in the standard jury instructions. (See *People v. Wilson, supra,* 186 Cal.App.4th at p. 808; *Fierro, supra,* 180 Cal.App.4th at p. 1349; *In re Ricky T., supra,* 87 Cal.App.4th at pp. 1139-1140; CALCRIM No. 1300.)

Nor does Cox's reference to section 11418.5, subdivision (b), assist him. We have no quarrel with the notion that a victim's fear may be proven circumstantially by reference to his or her conduct after threats are made. But this is not the *only* permissible method of proving the element. Section 11418.5, subdivision (b), expressly states that sustained fear "can be established by, *but is not limited to*, conduct." (Italics added.) In any event, as we have discussed, the victims here did display conduct that suggested fear: they had McAllister's brother bring laundry to them so they could avoid walking home, and they called 911 after the second encounter with Cox. Even assuming section 11418.5, subdivision (b), is relevant, it is not inconsistent with our holding in *Allen* and does not suggest an evidentiary deficit here. The evidence was sufficient.

21

## DISPOSITION

The judgment is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


ALDRICH, J.


We concur:


KLEIN, P. J.


CROSKEY, J.

22